## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| LINDSAY FLECK, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| WILMAC CORPORATION, | : | NO.  10-05562 |
| WILMAC MEDICAL INSURANCE | : | |
| PLAN, ATTLEBORO ASSOCIATES, | : | |
| LTD., ATTLEBORO NURSING & | : | |
| REHABILITATION CENTER, and | : | |
| SUSAN MITCHELL, | : | |
| | : | |
| | : | |
| Defendants. | : | |

### MEMORANDUM

BUCKWALTER, S. J.                                                             March 27, 2012

Presently before the Court is the Motion of Defendants WILMAC Corporation, WILMAC

Medical Insurance Plan, Attleboro Associates, Ltd., Attleboro Nursing & Rehabilitation Center, and

Susan Mitchell (collectively "Defendants" or "Attleboro")[1] for summary judgment pursuant to

Federal Rule of Civil Procedure 56.  For the following reasons, the Motion is granted in part and

denied in part.

### I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This matter involves a dispute between Plaintiff Lindsay Fleck ("Plaintiff" or "Fleck"), a

---

[1] Defendant WILMAC Corporation ("WILMAC") is a corporation based in Pennsylvania.
(Am. Compl. ¶ 10.)   Attleboro Associates, Ltd. is a subsidiary of WILMAC, and owns and
operates Attleboro Nursing and Rehabilitation Center.  (Id. ¶¶ 10–11.)  For clarity and ease of
reference, the Court collectively refers to these Defendants hereinafter as "Attleboro."

licensed physical therapist in the Commonwealth of Pennsylvania, and her former employer.

On March 26, 2006, Fleck injured her right ankle while playing volleyball.  (Pl.'s Resp. Opp'n to Defs.' Mot. Summ. J. ("Pl.'s Resp. Opp'n"), Ex. A ("Fleck Dep."), 19:23–24, 20:1–2.) The injury was chronic and required her to subsequently undergo several surgeries and treatments. (Id. at 20:5–24, 21:1–18.)  Specifically, Plaintiff was placed in a "CAM boot," a medical apparatus akin to an air cast, to assist her in the functions of standing and walking.  (Id. at 20:27, 55:7–11.)

Defendant Attleboro owns and operates a nursing rehabilitation center in Langhorne, Pennsylvania.  (Am. Compl. ¶¶ 8, 10–12; Defs.' Answer ¶¶ 8, 10–11. )  In the summer of 2006, Fleck completed a physical therapy internship at Attleboro's rehabilitation center.  (Fleck Dep. 23:6–11.)  According to Plaintiff, she wore her CAM boot during the duration of her internship.  (Id. at 58:13–14.)  Plaintiff applied for a permanent, full-time position with Attleboro on March 23, 2007.  (Defs.' Mot. Summ. J., Ex. 11 attached to Ex. A ("Fleck Employment Application").)  Upon completing the Employment Application, Fleck signed an acknowledgment which stated that she understood her employment was "subject to meeting medical standards."  (Id.)

In early August 2007, Plaintiff underwent surgery on her ankle.  (Fleck Dep. 21:24, 22:1.) A few weeks later, she was hired by Attleboro as a licensed physical therapist, despite the fact that she had not yet recovered from her surgery and still could not stand or walk at this point in time.  (Id. 22:2–11.)   As a physical therapist, Fleck's job duties included supervising physical therapy assistants.  (Id.)  Upon accepting the position, Fleck signed a form that detailed the physical demands required by the position, including: "Good physical and mental health.  Must be able to withstand strenuous physical activity [including] . . . continuous standing, walking, reaching, bending, transporting, pushing, pulling, stooping, kneeling, crouching, handling and palpation, and lifting in

2

excess of 50 pounds[.]" (Defs'. Mot. Summ. J., Ex. 11 attached to Ex. A ("Job Description Form").)

Fleck signed the Job Description Form, thereby acknowledging that she was "capable of performing

all tasks described [t]herein with or without accommodation." (Id.) Fleck alleges that Attleboro was

aware of her physical limitations at the time of her hiring because she was not "cleared to do any

treatment" of patients. (Fleck Dep. 22:11–12.) Plaintiff was subsequently cleared by her doctor to

perform the full duties of her job description without any restrictions in November of 2007. (Id. at

22:13–23.)

On August 7, 2008, Plaintiff notified her supervisor at Attleboro, Program Manager Rachel

Schmidt ("Schmidt"), that she needed additional surgery on her ankle. (Id. at 62:16–20.) Schmidt

instructed Fleck to obtain the necessary paperwork from Attleboro's Human Resources

Representative, Defendant Susan Mitchell ("Mitchell"). (Id. at 62:19.) Plaintiff allegedly requested

the paperwork from Mitchell several times to no avail. (Id. at 63:9.) Mitchell denies this allegation,

and maintains that she gave Fleck the paperwork the first time it was requested. (Defs.' Mot. Summ.

J., Ex. C ("Mitchell Dep.") 15:12–19, 16:6–8.)

A few days later on August 15, 2008, Plaintiff was disciplined for her behavior during an

incident with a patient and a music therapist at Attleboro, which had prompted the music therapist

to file a formal complaint against her. (Fleck Dep. 38:4–6; Defs.' Mot. Summ. J., Ex. 2 attached

to Ex. B ("Comment/Concern Form").) Fleck had placed a speed-restricting device on the patient's

wheelchair, and allegedly reacted in a "rude, disrespectful, and inappropriate" manner when the

music therapist requested to have the device removed. (Fleck Dep. 28:15–24, 29:2–4, 32:11–24,

33:3-11; Comment/Concern Form.) On August 27, 2008, Plaintiff was issued a formal written

disciplinary notice reprimanding her for her actions during the incident. (Pl.'s Resp. Opp'n, Ex. C

3

("Fleck Disciplinary Notice").)  Plaintiff thereafter appealed her disciplinary notice, but was unsuccessful.  (Fleck Dep. 41:11–17.)  She now alleges that this "overblown response" to the incident was in retaliation for her earlier request to take FMLA leave.  (Id. at 63:15–24; Pl.'s Resp. Opp'n 4.)

Also on August 27, 2008, Plaintiff received her annual review from Schmidt, which had allegedly been prepared in weeks prior.  (Defs.' Mot. Summ. J., Ex. 5 attached to Ex. B ("Fleck Performance Evaluation").)  Upon receiving her review, Fleck once again reviewed a Job Description Form indicating that she could "continuously" engage in strenuous physical activity.  (Def.'s Mot. Summ. J., Ex. E, ("Job Description Form").)  At no point during this meeting did Fleck inform Schmidt that she was or would be unable to perform any of the essential functions listed under her job description.  (Fleck Dep. 62:7–10.)  Fleck signed the Job Description Form, indicating that she would be able to meet the "physical demands" provided by the job description "with or without accommodation."  (Job Description Form.)  Subsequently,  Fleck submitted a doctor's note on September 5, 2008, stating that she could work "without restrictions" while wearing the CAM boot.  (Pl.'s Resp. Opp'n, Ex. G ("Dr.'s Note 9/5/08").)  Plaintiff asserts that her CAM boot qualified as a "reasonable accommodation" which aided her in the performance of her job duties and allowed her to work without any additional restrictions.  (Pl.'s Resp. Opp'n 8.)

Plaintiff underwent additional surgery on her ankle on November 20, 2008.  (Pl.'s Resp. Opp'n, Ex. H ("FMLA Paperwork").)  Immediately prior to her surgery, Plaintiff alleges that Mitchell unnecessarily delayed and refused to file paperwork related to her short-term leave.  (Fleck Dep. 70:1–24, 89:12–13.) Plaintiff further avers that when Mitchell finally submitted the paperwork, she intentionally provided Fleck's insurer with incorrect salary information.  (Id. at 89:17.) Mitchell,

however, contends that she never submitted short-term disability paperwork until the day of an employee's surgery because there was always the possibility that the surgery would not occur.  (Id. at 71:4–7.)  In fact, on November 20, 2008—the same day as Fleck's surgery—Mitchell sent Fleck a letter stating that her request for FMLA leave was approved for the time period between November 20, 2008 and February 12, 2009.  (Pl.'s Resp. Opp'n, Ex. I, ("Leave Approval Letter").)  That same day, Mitchell also faxed Fleck's paperwork to the disability carrier. (Defs.' Mot. Summ. J., Ex. 15 attached to Ex. B ("11/20/08 Fax Sheet").)  Fleck acknowledges that after her surgery, she was permitted to take FMLA leave and that her leave period was not questioned or interfered with in any way.  (Fleck Dep. 65:9–14.)

According to Fleck's Leave Approval Letter, she was required to inform Attleboro of her status and intent to return to work at least two weeks prior to the end of her leave period, and, in the event of a need for leave extension, she needed to provide Attleboro with "reasonable notice."  (Ex. I, Leave Approval Letter.)  Fleck did not, however, contact Attleboro within the requisite time frame or request additional leave.  Instead, she submitted a doctor's note on February 6, 2009—seven days after she was required to contact Attleboro—which stated that she could return to work on February 12, 2009, but would only be able to work for four hours per day.  (Pl.'s Resp. Opp'n, Ex. K ("Dr.'s Note 2/4/09").)  The note did not indicate when, if ever, the restriction would be lifted or if Plaintiff would require additional accommodations in the execution of her job duties.  Upon receipt of the note, Mitchell contacted Schmidt to discuss Fleck's future schedule in light of her new time restriction. (Mitchell Dep. 33:18–25.) Schmidt allegedly informed Mitchell that she could not recall any other employee that was previously permitted to work part-time in such an instance, and that it would be too difficult to find staff coverage to accommodate Fleck's reduced work hours.  (Id. at

5

34:3–7; Schmidt Dep. 87:1–17.)  Therefore, on February 6, 2009, Mitchell and Schmidt called Fleck to inform her that her position was terminated because she had exhausted her permitted twelve weeks of FMLA leave and Attleboro could not accommodate her additional restrictions.  (Id. at 36:14–25, 37:1–13.)  Plaintiff asserts that at this point she requested to formally extend her leave or to have the opportunity to speak with her doctor to arrange a new schedule, but Mitchell and Schmidt allegedly told her that "it was too late for that" and refused to consider whether a different accommodation would allow Plaintiff to return to work.  (Fleck Dep. 75:1–6.)  Mitchell and Schmidt did tell Fleck, however, that she could reapply for the position when she was able to work without restrictions and could complete the full range of job duties.  (Mitchell Dep. 38: 24–25, 39:1–5; Defs.' Mot. Summ. J.,  Ex. 18 attached to Ex. B ("Fleck Termination Letter").)  Consequently, Plaintiff did not return to work at the end of her FMLA leave on February 12, 2009.  She received a letter on this day stating that she was being voluntarily terminated "based on the failure to return from a leave of absence." (Fleck Termination Letter.)

Following her termination on February 6, 2009, Fleck allegedly made several attempts to contact Mitchell, but received no response  until February 12, 2009—the day that her FMLA leave formally expired.  (Pl.'s Resp. Opp'n 14; Fleck Dep. 79:1.)  Ten days later, on February 16, 2009, Plaintiff discussed her post-termination healthcare benefits with Mitchell, and was told she was eligible for benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") and that she would receive notification of her COBRA benefits when her primary insurance expired.  (Fleck Dep. 85:2–19; Mitchell Dep. 43:4–25, 44:1–19.)  Plaintiff did not receive such notice until almost ten months later on November 23, 2009, despite the fact she believed her primary insurance had ended in February of 2009.  (See Pl.'s Resp. Opp'n, Ex. S ("COBRA Benefits

Letter");  Fleck Dep. 85:16–19.)

Plaintiff commenced this judicial action on October 21, 2010 after exhausting her administrative remedies.  On December 10, 2010, she filed an Amended Complaint, asserting violations of: (1) the Americans with Disabilities Act of 1990 ("ADA") and the Americans with Disabilities Amendments Act ("ADAAA"), 42 U.S.C. § 12101 et seq., for disability discrimination (Count I) and failure to accommodate (Count III); (2) the Pennsylvania Human Relations Act ("PHRA"), 42 P.S. § 951 et seq., for disability discrimination (Count II) and failure to accommodate (Count IV); (3) the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 1001 et seq. (Count V); (4) the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. (Count VI); and (5) COBRA, 29 U.S.C. §§ 1161-1169, and the ARRA, Pub. L. No. 111-5 123 Stat. 115 (2009) (Count VII).  On December 30, 2010, Defendants moved to dismiss Plaintiff's ADA, PHRA, and FMLA claims (Counts I–V) for insufficient pleading, the ERISA and COBRA claims (Counts VI and VII) for failure to specify damages, all claims for emotional distress and punitive damages, and all individual claims asserted against Defendant Mitchell.  On May 19, 2011, this Court granted in part and denied in part Defendants' Motion to Dismiss.  Specifically, this Court declined to dismiss: (1) Plaintiff's ADA and PHRA claims for disability discrimination and failure to accommodate; (2) Plaintiff's FMLA retaliation claim; (3) Plaintiff's FMLA interference claim to the extent it relied upon Defendants' unwarranted issuance of discipline and failure to timely submit FMLA paperwork; (4) Plaintiff's ERISA claim in its entirety; (5) Plaintiff's COBRA claim in its entirety; and (6) all individual claims asserted against Defendant Mitchell.  The Court did, however, grant dismissal of: (1) Plaintiff's interference claim with respect to the termination of her position and Defendants' refusal to provide her with reasonable accommodation; (2) Plaintiff's claims for punitive and

compensatory damages under ERISA; and (3) Plaintiff's claims for punitive damages under COBRA.  On January 4, 2012, Defendants moved for summary judgment in their favor on the remaining claims.  Plaintiff filed a Response in Opposition on January 25, 2012, and Defendants replied on February 3, 2012.  The Court will now consider the merits of Defendants' Motion for Summary Judgment.

## II.   STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. Cnty of Allegheny, Pa., 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325.  Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249.  Summary judgment may be granted when "the evidence is merely colorable . . . or is not significantly probative." Id. at 249–50 (citations omitted).

## III.   DISCUSSION

Defendants move for summary judgment in their favor on Plaintiff's remaining ADA, PHRA, FMLA, ERISA, and COBRA claims, as well as on all claims asserted against Defendant Mitchell individually.  The Court considers each claim individually below.

### A.   The ADA and PHRA Claims[2]

Plaintiff alleges that Defendants violated the ADA and PHRA by: (1) issuing her an unwarranted disciplinary notice and then subsequently terminating her position based on her alleged disability; and (2) failing to provide or even discuss a reasonable accommodation for her disability.  In response, Defendants contend that they are entitled to summary judgment as a matter of law because there is no issue of material fact that Plaintiff was not terminated on account of her

---

[2]  The same legal standard is used to analyze claims under the ADA and PHRA.  Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).  Therefore, the Court's ensuing discussion of Plaintiff's ADA claims also applies to her PHRA claims.

disability.

The ADA, codified at 42 U.S.C. § 12112, prohibits employers from discriminating against qualified employees on the basis of a disability.  Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1995).  Notably, in defining the phrase "discriminate against a qualified individual on the basis of disability," the statute lists an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A).  The statute further provides that an employer is not in violation of the ADA if it can demonstrate that such accommodations would impose an "undue hardship" on the operation of its business.  Id.

In analyzing discrimination claims brought under the ADA, courts apply the burden-shifting framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973).  See Fink v. Global Emp't Solutions, Inc., No. Civ.A.08-5816, 2010 WL 1741358, at * 2 (E.D. Pa. Apr. 28, 2010) (further citation omitted).  The McDonnell Douglas framework utilizes a three-step process to determine whether an employer intentionally discriminated against an employee.  Under the first step, the burden is initially placed on the  plaintiff to establish a prima facie case of discrimination.  McDonnell Douglas, 411 U.S. at 802.  Upon successfully making out a prima facie case, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its termination of the plaintiff.  Id. at 802.  The third step requires the employee to prove by a preponderance of the evidence that the employer's asserted reason was nonetheless pretextual.  Id. at 804.

### 1.    Prima Facie Case of Discrimination

To establish a prima facie case of discrimination under the ADA, a claimant must prove three

elements: (1) she is "disabled" within the meaning of the ADA; ( 2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) she has suffered an adverse employment decision as a result of discrimination. Gaul v. Lucent Tech., 134 F.3d 576, 580 (3d Cir. 1998) (citing Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996)). Thus, Defendants will only have violated Plaintiff's ADA and PHRA rights if she can satisfy all three elements.

### a.    Is Fleck "Disabled" Within the Meaning of the ADA?

A person is "disabled" within the meaning of the ADA if she can prove one of the following: (1) she has a physical or mental impairment that substantially limits one or more major life activities; (2) she has a record of such an impairment; or (3) she is regarded as having such an impairment.  See Kelly, 94 F.3d at 105 (citing 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g)) (internal quotations omitted).  Fleck alleges that she can satisfy all three definitions, but because the Court finds that genuine issues of material fact remain as to whether her ankle injury substantially limited a major life activity, it need not reach her arguments based on the second and third definitions.  See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (finding that the court need not reach plaintiff's other two arguments because she successfully established first statutory definition provided by the ADA).

While the ADA does not explicitly define a "major life activity," the Third Circuit has recognized that an individual is substantially limited if she is "unable to perform a major life activity that an average person in the general population can perform[,] or is significantly restricted as to the condition, manner or duration under which [s]he can perform a particular major life activity as compared to . . . the general population." Kelly, 94 F.3d at 105 (internal quotations and alterations

11

omitted).   Whether an impairment constitutes a substantial limitation is an "extraordinarily fact-intensive" inquiry that should be conducted on a case-by-case basis.   See Emory v. AstraZeneca Pharm. LP, 401 F.3d 174, 182 (3d Cir. 2005).   In making such a determination, inquiries of particular importance are the nature and severity of the impairment, the duration or expected duration of the impairment, and its permanent or long-term impact.   Kelly, 94 F.3d at 105 n.4 (further citation omitted).

In the instant case, Fleck avers that the chronic, non-healing injury to her ankle substantially impaired two major life activities: her ability to walk for more than a half mile or a mile and her ability to stand in excess of one hour without a break or the assistance of her CAM boot.   (Fleck Dep. 22:10–12, 60:23–24, 61:1–6.)   The ADA explicitly recognizes "walking" and "standing" as major life activities.   See 42 U.S.C. § 12102(2)(A) ("[M]ajor life activities include . . .  walking [and] standing[.]").   While the Third Circuit previously recognized in Kelly v. Drexel University, 94 F.3d 102 (1996) that a claimant's inability to walk or jog for more than a mile did not constitute a "disability" within the meaning of the ADA, one of the primary factors motivating the court's decision was the fact that the claimant presented no evidence that he required any special devices, such as crutches or a cane, to assist him in walking.   See id. at 108.   Other courts have likewise found that an individual's ability to walk or stand is substantially impaired based on the use of a walking aid.   See Quick v. Albert Einstein Healthcare, No. Civ.A.05-4940, 2007 WL 3085868, at *12 (E.D. Pa. Oct. 23, 2007) (citing individual's use of a cane to aid in walking as indicative of limiting his ability to walk); Brown v. Showboat Atlantic City Propco., LLC, No. Civ.A.08-5145, 2010 WL 5237855, at *13–14 (D.N.J. Dec. 16, 2010) (finding that an individual's inability to walk more than sixty feet without the assistance of a medical device constituted a disability under the ADA);

12

Mastrolia v. Potter, No. Civ.A.08-5967, 2010 WL1752531, at *6 (D.N.J. Apr. 27, 2010) (same);

Stone v. Entergy Servs., Inc., No. Civ.A. 94-2669, 1995 WL 368473, at *4 (E.D. La. June 20, 1995).

Here, Fleck has introduced evidence—specifically notes from her doctors—indicating that

she could not walk or stand for extended periods of time without a break or the assistance provided

by her CAM boot.  (See Dr.'s Note 9/5/09; Dr.'s Note 2/4/09.)  A reasonable factfinder could

conclude from this evidence that the nature and severity of Fleck's injury substantially limited her

ability to perform the major life activities of walking and standing, and she therefore is considered

"disabled" within the meaning of the ADA.

### b.   Was Fleck Otherwise Qualified to Perform the Essential Functions of her Job, With or Without Reasonable Accommodations by Defendants?

The Court next considers whether Fleck, despite being disabled, was nonetheless qualified

to perform the essential functions of her job with or without accommodation.  The Third Circuit

utilizes a two-pronged test in making such a determination.  Gaul v. Lucent Tech., Inc., 134 F.3d

576, 580 (3d Cir. 1998).  Under the first prong, the court considers "whether the individual satisfies

the prerequisites for the position, such as possessing the appropriate educational background,

employment experience, skills, licenses, etc." Id.  (internal citations and quotations omitted).  The

second prong addresses "whether or not the individual can perform the essential functions of the

position held or desired, with or without reasonable accommodation."  Id.  (internal citations and

quotations omitted). To determine the appropriate reasonable accommodation, "it may be necessary

for the [employer] to initiate an informal, interactive process with the [employee] . . . [which] should

identify the precise limitations resulting from the disability and the potential reasonable

accommodations that could overcome those limitations." Taylor, 184 F.3d at 311 (quoting 29 C.F.R.

13

§ 1630.2(o)(3)) (internal quotations omitted).  If the employer can demonstrate, however, that the accommodation would impose an undue hardship on the operation of its business, then it will not be found to have violated the ADA.  42 U.S.C. § 12111(10).

In this case, Defendants do not claim that Plaintiff lacked the requisite skills, experience, or education for her position as a licensed physical therapist.  Rather, the issue in dispute is whether Fleck could perform the essential functions of her job with or without reasonable accommodations following her return from short-term leave.  Defendants contend that prior to her November 2008 surgery, Plaintiff was able to work a full-time schedule without any additional assistance, and that her inability to subsequently return to full-time employment rendered her unqualified for ADA protection.  (Defs.' Mot. Summ. J. 21–22.)  Moreover, Defendants cite to Plaintiff's signature on her August 2008 Job Description Form, certifying that she was able to "*continuously* stand [and] walk" as evidence that Fleck did not require any additional accommodations.  (Job Description Form (emphasis added).)  In response, Plaintiff avers that Defendants' argument ignores the fact that she informed her employer she could return to work with the reasonable accommodation of a reduced work schedule or extended leave.  (Pl.'s Resp. Opp'n 20.)  Fleck further alleges that her use of a CAM boot served as a mitigating measure which allowed her to perform the essential functions of her job.  (Id.; Dr.'s Note 9/5/08.)  Finally, Fleck asserts that Defendants blatantly refused to provide or even discuss potential accommodations for her alleged disability.  (Pl.'s Resp. Opp'n 20.)

The records contains sufficient evidence for a jury to conclude Fleck could perform the essential functions of her job if Attleboro reasonably accommodated her.  Prior to the end of her FMLA leave, Fleck presented Defendants with a doctor's note stating that she could return to work but would require reduced hours.  (Dr.'s Note 2/4/09.)  At her deposition, Plaintiff testified that

14

immediately after she was terminated, she contacted her physician and was advised that she could work longer hours but would require additional breaks in between. (Fleck Dep. 71:21–24, 76:1–24, 77:1–12.) The ADA explicitly recognizes "job restructuring" and "part-time or modified work schedules" as an example of a reasonable accommodation. 42 U.S.C. § 12111(9). Moreover, Fleck introduced evidence showing that she wore her CAM boot for a substantial part of her internship and subsequent full-time employment position with Attleboro, and had previously provided Defendants with a doctor's note stating that she was required to wear the medical device while she worked. (Fleck Dep. 58:11–24; Dr.'s Note 9/5/08.) Defendants acknowledge her prior use of the CAM boot. (Mitchell Dep. 9:11-13, 12:9–25.) Further, the record is devoid of any evidence that they previously failed to accommodate Fleck's requests to utilize the boot or believed she could not perform the essential functions of her job with its assistance.

Moreover, significant questions remain as to whether or not Defendants initiated or engaged in an interactive process with Fleck as required by the ADA. The EEOC Guidelines provide that:

> Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation[,] . . . [which] is best determined through a flexible, interactive process that involves both the employer and employee with a disability.

Taylor, 184 F.3d at 311 (quoting 29 C.F.R. Pt. 1630, App § 1630.9 at 359) (internal quotations omitted). The Third Circuit breaks the interactive process down into two steps: (1) providing adequate notice to the employer, followed by (2) interactive communication between the employer and employee. Taylor, 184 F.3d at 312–13.

In regard to the first step, the employee must provide the employer with reasonable notice of her request for an accommodation. "[W]hile the notice does not have to be in writing, be made

15

by the employee [herself], or formally invoke the magic words 'reasonable accommodation,' the notice nonetheless must make clear that the employee wants assistance for . . . her disability." Id. at 313.  Furthermore, "[w]hat information the employee's initial notice must include depends on what the employer knows." Id.  Here, Fleck requested that Attleboro accommodate her disability by permitting her to work a part-time schedule while wearing her CAM boot, or, in the alternative, to extend her leave.[3]  Plaintiff asserts, *inter alia*, that Defendants had adequate notice of her need for an accommodation because: (1) they never before objected to her utilization of the CAM boot to assist in performing her job duties (Fleck Dep. 56: 6–23, 59:19–21; Mitchell Dep. 9:3–7, 12: 9–25), (2) received doctors' notes stating that she could execute her job duties with the assistance of the CAM boot (Dr.'s Note 9/5/08) and/or a modified work schedule (Dr.'s Note 2/4/09), and (3) because she requested to alter her schedule or extend her leave during her phone conversation with Mitchell and Schmidt  (Fleck Dep. 75:1–6.)  Based on this evidence, a factfinder could conclude that Defendants received reasonable notice of Fleck's request for an accommodation.

The second step requires the Court to consider the employer and employee's respective duties once the interactive process comes into play.  Taylor, 184 F.3d at 317.  The Third Circuit has recognized that this process requires "a great deal of communication between the employee and employer."  Id. at 312 (quoting Bultemeyer v. Fort Wayne Cmty.Sch., 100 F.3d 1281, 1285 (7th Cir. 1996)) (further citation omitted).  Moreover, the EEOC Guidelines require the employer to make a "reasonable effort to determine [ ] appropriate accommodation."  Taylor, 184 F.3d at 316 (quoting 29 C.F.R. Pt. 1630, App. § 1630.9 at 359).  Employers can do so in several ways, including: meeting

---

[3] Throughout her briefing submitted to the Court, Plaintiff often conflates her request for a reduced work scheduled and her utilization of the CAM boot as examples of "reasonable accommodations" that Defendants failed to consider.

with the employee, requesting more information about the employee's conditions and limitations, offering to discuss available alternatives, or, at a minimum, showing at least "some sign of having considered the employee's request." Id. at 317. The Third Circuit has acknowledged that such efforts on the employer's part do not impose an undue hardship on the operation of its business. Id.

A reasonable jury could conclude that Defendants did not engage in an interactive process with Fleck. Following Plaintiff's accommodation requests, no individual offered to meet with her to discuss available alternatives or the exact limitations of her condition. Nor did Defendants request more information about her condition, such as when the potential restrictions would be lifted or how long she would be required to wear the CAM boot and work reduced hours. Instead, Fleck maintains that Mitchell and Schmidt simply told her that they could not accommodate her request because it would be too difficult to find additional staff coverage and that no other employees had previously been permitted to work reduced hours under such circumstances. Plaintiff has introduced the affidavit of physical therapy assistant Dawn Handel, however, which states that Handel was permitted to work part-time hours when she returned from leave. (Pl.'s Resp. Opp'n, Ex. L ("Handel Affidavit").) Moreover, at her deposition Plaintiff testified that when she offered to contact her physician to discuss a modification of her permitted work hours, Mitchell and Schmidt refused to consider this offer and informed her that it was "too late for that." (Fleck Dep. 75:1–6.) Thus, based on the above, it remains disputed whether Defendants engaged in an interactive process with Fleck.

### c.    Has Fleck Suffered An Adverse Employment Action As a Result of Defendants' Discrimination?

Having concluded that significant issues remain in dispute as to whether Fleck was disabled and could perform the essential functions of her job with reasonable accommodation, the Court next considers whether she suffered an "adverse employment action" as a result of discrimination. Fleck

17

asserts that she suffered two adverse employment actions: (1) Defendants issued her an unwarranted written disciplinary notice; and (2) Defendants unlawfully terminated her employment position without reasonable basis.

In 2006, the Supreme Court refined the definition of an "adverse employment action" in Burlington Northern & Santa Fe Railway Company v. White, 548 U.S. 53 (2006),[4] providing that alleged retaliatory actions are "materially adverse" if they would "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination."[5] Id. at 57. The Third Circuit has recognized that such inquiries are to be made on a case-by-case basis, and that "an act that would be immaterial in some situations is material in others." St. John v. Potter, No. Civ.A.09-4196, 2011 WL 780685, at *8 (E.D. Pa. Mar. 4, 2011) (internal quotations and further citation omitted).  While the inquiry is context-specific, "petty slights, minor annoyances, and simple lack of good manners . . .  will not normally constitute materially adverse employment actions, even if they follow protected conduct." Hare v. Potter, 220 F. App'x 120, 127–28 (3d Cir. 2007) (quoting Burlington, 548 U.S. at 69).

---

[4] Prior to 2006, "adverse employment actions" were defined as actions that "alter[ ] the employee's compensation, terms, conditions, or privileges of employment, deprive[ ] him or her of employment opportunities, or adversely affect[ ] his or her status as an employee." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1297 (3d Cir. 1997) (internal quotations omitted).  In making their argument, Defendants cite to case law relying on this earlier standard to support their argument.  However, as noted by the Court above and in its Memorandum at the motion to dismiss stage, see Fleck v. Wilmac Corp., et. al., No. Civ.A.10-05562, 2011 WL 1899198, at *10 n.18 (E.D. Pa. May 19, 2011), this definition was refined in Burlington, when the Supreme Court specifically held that retaliation claims are no longer "limited to discriminatory actions that affect the terms and conditions of employment." Burlington, 548 U.S. at 64 (internal citation omitted). As such, Defendants' reliance on these pre-Burlington cases is misplaced.

[5] Although Burlington was a Title VII retaliation case, the Third Circuit applies the same definition of an "adverse employment action" to retaliation claims under the ADA.  See Griffin v. De Lage Landen Fin. Serv., Inc., 219 F. App'x 245, 247 n.1 (3d Cir. 2007) (internal citation and quotations omitted).

As an initial matter, Fleck alleges that she received the disciplinary notice as a result of her request for FMLA leave, and not on account of her alleged disability. The ADA addresses discrimination based on an employee's *disability*—not discrimination stemming from the invocation of *FMLA* rights. Plaintiff's ADA adverse employment action claim based on the disciplinary notice is therefore misplaced. As such, Fleck has failed to establish a prima facie case of retaliation based on the issuance of the disciplinary notice, and Defendants are therefore entitled to summary judgment on this claim.

Fleck also asserts that she suffered an adverse employment action because she was unlawfully terminated from her employment position. Specifically, Plaintiff avers that the decision to fire her was partially motivated[6] by Defendants' refusal to accommodate her disability. In order to constitute an adverse employment action under the Burlington standard, Fleck's termination must be the type of action that would "dissuade" a reasonable worker from asserting a discrimination claim against her employer. Courts within the Third Circuit have explicitly recognized that "[c]ertainly, termination would dissuade a reasonable employee from opposing discrimination." Lindsey v. N.J. Dep't of Corr., No. Civ.A.04-3815, 2007 WL 836667, at *13 (D.N.J. March 14, 2007) (citing Moore v. City of Phila., 461 F.3d 331, 341 (3d Cir. 2006)). Thus, summary judgment on this claim is denied, as Plaintiff has adduced sufficient facts to establish a prima facie case of retaliation based on her alleged unlawful termination.

### 2.        The Legitimate, Nondiscriminatory Reason

Having found that Plaintiff could satisfy the first step of the McDonnell Douglas framework,

---

[6] Fleck also asserts that Defendants' decision was motivated by her absence due to her legally-protected FMLA leave. Even though Plaintiff conflates her analysis of these two motivations in her brief, the Court analyzes her FMLA claim separately below.

the burden now shifts to Defendants to articulate a legitimate, nondiscriminatory reason for their actions.  The Third Circuit has recognized that an employer need only introduce evidence "which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision" in order to satisfy its burden at this step.  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (further citation omitted).

Here, Defendants assert that Fleck was terminated for the legitimate, nondiscriminatory reason of Attleboro's inability to accommodate her request for a reduced work schedule upon her return from leave.  While on its face this reason appears to be legitimate and nondiscriminatory, the Court is admittedly concerned by Defendants' rationale supporting its reason.  Defendants rely on this Court's previous dismissal of Plaintiff's FMLA interference claim at the motion to dismiss stage, quoting our language that "[b]ecause Plaintiff could not return to her previous full-time position without some form of accommodation, she was not entitled to reinstatement pursuant to the FMLA."  (Defs.' Mot. Summ. J. 22 (quoting Fleck, 2011 WL 1899198, at *8).)  Essentially, Defendants' reasoning is that because Attleboro's failure to reinstate Plaintiff to her position upon her return is not discriminatory under the FMLA, this constitutes a legitimate, nondiscriminatory reason for purposes of the ADA.  As noted by the Third Circuit, however, "the leave provisions of the FMLA are wholly distinct from the reasonable accommodation obligations of employers covered under the ADA."  Robinson v. Lockheed Martin Corp., 212 F. App'x 121, 125–26 (3d Cir. 2007) (quoting Vincent v. Wells Fargo Guard Servs., Inc. of Fla., 3 F. Supp. 2d 1405, 1420 (S.D. Fla. 1998)); see also 29 C.F.R. § 825.702(a).  Thus, while one could potentially read Defendants' allegation to constitute a *nondiscriminatory* reason, the Court questions whether their ignorance of statutory interpretation would also constitute a *legitimate* reason.  Neither Defendants nor Plaintiffs

have briefed this issue for the Court. In the absence of further briefing, and given the "relatively light" burden placed on defendant employers at this stage of the McDonnell Douglas framework, see Fuentes, 32 F.3d at 763, the Court shall assume—for purposes of this Motion only—that Defendants' assertions could potentially constitute a legitimate, nondiscriminatory reason. For this reason, the Court proceeds to the final step of the McDonnell Douglas framework.

### 3. Pretext

Assuming *arguendo* that Defendants could assert a legitimate, nondiscriminatory reason for their actions, the Court next considers whether their termination of Plaintiff was pretextual. To establish pretext, the employee must "cast [ ] sufficient doubt" upon the alleged legitimate, nondiscriminatory reason proffered by the employer "so that a factfinder could reasonably conclude that [the] reason was a fabrication . . . or that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Stouch v. Twp. of Irvington, No. Civ.A.08-3264, 2009 WL 4048849, at * 4 (3d Cir. Nov. 24, 2009) (quoting Fuentes, 32 F.3d at 762)). In doing so, the employee cannot merely demonstrate that the reason was wrong or mistaken, but rather must articulate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Fink, 2010 WL 1741358, at *4 (quoting Fuentes, 32 F.3d at 765)) (internal quotations and further citation omitted).

In the instant case, genuine issues of material fact remain as to the exact basis upon which Defendants decided to terminate Fleck. Defendants assert that no other employees had previously been granted a request for reduced work hours and that Attleboro was unable to accommodate

21

Plaintiff's request due to a lack of staff coverage.  (Mitchell Dep. 34:3–7.)  Fleck, however, introduces the affidavit of another Attleboro employee stating that she was permitted to work reduced hours upon her return from leave, (see Handel Affidavit), as well as evidence indicating that Attleboro continued to temporarily staff Fleck's position until a full-time replacement was eventually hired in June of 2009.  (See Pl.'s Resp. Opp'n, Ex. R., ("Angela George Hiring Sheet").)  Thus, Fleck has demonstrated "weaknesses and inconsistencies" in Defendants' asserted reasoning such that a reasonable jury could find them unworthy of credence.

Based on all of the above, it is evident that genuine issues of material fact remain in dispute regarding Fleck's ADA and PHRA claims based on her alleged unlawful termination.  As such, granting summary judgment on these claims would be inappropriate at this time.  The record is clear, however, that Fleck's written disciplinary notice was not issued due to her disability, and therefore summary judgment is granted to the extent that Fleck's ADA and PHRA claims rely on her alleged "unwarranted written discipline."  (Pl.'s Resp. Opp'n 29.)

### B.    The FMLA Claims

The FMLA entitles "employees to take reasonable leave for medical reasons[.]"  29 U.S.C. § 2601(b)(2).  The FMLA affords employees two distinct types of rights: (1) substantive rights, and (2) proscriptive rights.  Dogmanits v. Capital Blue Cross, 413 F. Supp. 2d 452, 462 (E.D. Pa. 2005).  Substantive rights entitle eligible employees to take up to twelve weeks of unpaid leave for serious health conditions and reinstatement upon their return.  29 U.S.C. §§ 2612(a)(1), 2614(a)(1).  Proscriptive rights, on the other hand, prohibit employers from retaliating against employees for exercising their substantive rights under the FMLA. Dogmanits, 413 F. Supp. 2d at 463.  The issue presently before the Court involves Plaintiff's proscriptive rights, specifically whether Defendants

unlawfully retaliated against her for taking FMLA leave.[7]

The FMLA protects employees' proscriptive rights by making it unlawful "for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). As with other retaliation claims, the Court utilizes the familiar <u>McDonnell Douglas</u> burden-shifting framework. <u>See</u> <u>Sherrod v. Phila. Gas Works</u>, 209 F. Supp. 2d 443, 451 (E.D. Pa. 2002).

### 1.      Prima Facie Case of Retaliation

To establish a prima facie case of retaliation under the FMLA, the first step of the <u>McDonnell Douglas</u> framework requires a plaintiff to prove that: (1) she took an FMLA leave; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to her leave. <u>See</u> <u>Capilli v. Whitesell Constr. Co.</u>, 271 F. App'x 261, 265 (3d Cir. 2008) (citing <u>Conoshenti v. Pub. Serv. Elec. & Gas Co.</u>, 364 F.3d 135, 146 (3d Cir. 2004)) (internal quotations omitted). In the instant action, neither party disputes that Plaintiff took a short-term leave of absence

---

[7] In her Amended Complaint, Fleck actually contends that Defendants violated both her substantive and proscriptive rights. (Am. Compl. ¶¶ 78–84.) In its May 19, 2011 Memorandum and Order, the Court declined to dismiss Plaintiff's proscriptive rights claims, but partially dismissed her substantive rights claims. Specifically, the Court dismissed Fleck's substantive rights claims to the extent that they were based on Defendants' alleged refusal to afford her a reasonable accommodation and/or terminated her employment during her last week of FMLA leave, but permitted Plaintiff to proceed forward to the extent her claims were based on Defendants' alleged issuance of unwarranted discipline and delay in providing FMLA paperwork.

In Defendants' Motion for Summary Judgment presently before the Court, Defendants mistakenly assert that "this Honorable Court dismissed . . . Fleck's [substantive] FMLA interference claim on May 19, 2011," and therefore only move for summary judgment on Plaintiff's proscriptive rights claims. (Defs.' Mot. Summ. J. 11.) As explained above, however, the Court did not dismiss Fleck's substantive rights claims in their entirety. Therefore, the Court will only address whether Defendants are entitled to summary judgment on Fleck's proscriptive rights claims, and Plaintiff's substantive rights claims remain an issue to be decided by the jury at trial.

pursuant to the FMLA.[8]   Therefore, the Court only considers the second and third elements of a

prima facie case of retaliation below.

### a.        Did Fleck Suffer an Adverse Employment Action?

Fleck asserts that she is a victim of two adverse employment actions: (1) Defendants

disciplined her in retaliation for requesting FMLA leave; and (2) Defendants unlawfully terminated

her employment position in retaliation for taking FMLA leave.  In response, Defendants contend that

these instances fall outside the definition of an "adverse employment action."

In regard to her first allegation, Plaintiff avers that she suffered an adverse employment

---

[8] While Defendants do not dispute that Plaintiff took a valid leave of absence pursuant to the FMLA, they do argue that they are entitled to summary judgment because "there is no documentary evidence that Plaintiff in fact informed either Ms. Mitchell or Ms. Schmidt that she wanted to take FMLA leave in August." (Defs.' Mot. Summ. J. 13.)  As an initial matter, Defendants make this assertion in reference to the third element of a prima facie case of discrimination—whether the alleged adverse employment action was causally related to the FMLA leave—while Plaintiff addresses it at the first step of her analysis.  Regardless of when this argument is considered, however, Defendants' assertion mischaracterizes the summary judgment standard.  Under the Federal Rules of Civil Procedure, both parties must cite to specific materials in the record that demonstrate the existence or absence of a disputed issue of material fact at the summary judgment stage of proceedings.  See Fed. R. Civ. P. 56(c)(1)(A); Smith v. V.I. Port Auth., No. Civ.A.10-2230, 2012 WL 34670, at *3 (3d Cir. Jan. 9, 2012) (further citation omitted).  The Rules provide that such evidentiary materials include depositions.  Fed. R. Civ. P. 56(c)(1)A).  In the event that a conflict arises between the evidence presented by both parties, the Court must accept as true all allegations of the non-moving party and "all justifiable inferences are to be drawn in [her] favor."  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 255 (1986).

Here, both parties cite to the depositions of Fleck, Schmidt, and Mitchell in regard to whether or not Defendants were notified of Plaintiff's request to take FMLA leave in August of 2008.  In her deposition, Fleck avers that she requested FMLA leave in August of 2008.  (Fleck Dep. 62:16–17; 63:15–24.)  Schmidt and Mitchell, however, both contend that they do not recall if Fleck requested leave at this time.  (Mitchell Dep. 14:6–10; Schmidt Dep. 21:4–17.)  This constitutes a disputed issue of fact between the parties, and the Court is required to view the evidence in the light most favorable to the non-moving party.  Fleck does not move for summary judgment on this matter, and wishes to proceed forward to trial.  Thus, despite Defendants assertions to the contrary, this factual dispute does not entitle them to summary judgment, but rather serves as a disputed issue of fact to be decided by the jury at trial.

action because she received "unwarranted written discipline" from Defendants soon after she requested FMLA leave. (Pl.'s Resp. Opp'n. 29.)  The Court again applies the adverse employment action definition put forth by the Supreme Court in Burlington Northern & Santa Fe Railway Company v. White, 548 U.S. 53 (2006) to Fleck's FMLA claims.  See Ozlek v. Potter, 259 F. App'x 417, 423 n.5 (3d Cir. 2007) (recognizing that ADA and FMLA claims are analyzed according to the same legal standard).  In order to constitute an adverse employment action under Burlington's definition, receipt of the disciplinary letter must have constituted an action that would have "dissuaded" a reasonable employee from engaging in protected conduct.  The Court is not convinced that Defendants' actions rise to this level of severity.  First and foremost, in her briefing submitted to the Court, Fleck never asserts that the disciplinary notice was the type of action that could dissuade her from subsequently bringing a discrimination claim against Defendants.  Moreover, she has not shown that she suffered any "materially adverse" consequences as a result of the disciplinary notice.  To the contrary, it is undisputed that she was still able to take her twelve weeks of requested FMLA leave without interruption or further inquiry from Defendants. Nor has she put forth any evidence of economic loss, demotion, or decline in employment status that occurred as a result of the disciplinary notice.  In fact, in Mieczkowski v. York City School District, 414 F. App'x 441, 446–47 (3d Cir. 2011), the Third Circuit explicitly recognized that written letters of reprimand that "do not effect a material change in the terms or conditions" of one's employment cannot constitute adverse employment actions.[9]  Id. at 447 (citing Weston v. Pennsylvania, 251 F.3d 420, 431 (3d Cir. 2001)) (internal quotations omitted).  As such, Defendants' issuance of a disciplinary letter is

---

[9] While Mieczkowski did not directly utilize the new Burlington standard, the Court nevertheless finds its reasoning instructive in the instant case.

insufficient to constitute an adverse employment action.[10]

Plaintiff also asserts that she suffered an adverse employment action because she was unlawfully terminated from her employment position in retaliation for invoking her FMLA rights. Specifically, Fleck contends that Defendants' retaliation was motivated, at least in part, by the fact that she had been out on FMLA leave for twelve weeks and was still on leave at the time she was terminated.  It is well established within the Third Circuit that "firing an employee for [ ] valid [ ] FMLA leave may constitute . . . retaliation against the employee." Treaster v. Conestoga Wood Specialties, Corp., No. Civ.A.4:09-00632, 2010 WL 2606479, at *27 (M.D. Pa. Apr. 29, 2010) (quoting Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009)); see also Heard v. St. Luke's Hosp., No. Civ.A.08-5494, 2009 WL 3081513, at *6–7 (E.D. Pa. Sept. 28, 2009); Brown v. DB Sales, Inc., No. Civ.A.04-1512, 2005 WL 3591533, at *9 (E.D. Pa. Dec. 29, 2005); Keim v. National R.R. Passenger Corp., No. Civ.A.05-4338, 2007 WL 2155656, at *6–7 (E.D. Pa. July 26, 2007); Garrett v. Atlanticare Health Sys., Inc., No. Civ.A.07-5416, 2009 WL 3446755, at *4 (D.N.J. Oct. 21, 2009). As such, Fleck's alleged unlawful termination is sufficient to constitute an adverse

---

[10] Even if Plaintiff could establish that the written disciplinary notice constituted an adverse employment action, this action still would fail to constitute a prima facie case of retaliation because Fleck would be unable to satisfy step three of the prima facie case analysis—that the alleged adverse action was causally related to her request for FMLA leave. Fleck avers that she was disciplined because she requested FMLA leave in the days preceding receipt of the disciplinary notice.  The Third Circuit, however, has refused to infer a causal connection based on temporal proximity alone, and requires the introduction of "timing plus other evidence" to establish an employer's retaliatory motive.  See Schofield v. Metro. Life Ins. Co., 252 F. App'x 500, 504 (3d Cir. 2007) (quoting Weston v. Pennsylvania, 251 F.3d 420, 431 (3d Cir. 2001); Williams v. Phila. Hous. Auth. Police Dep't., 380 F.3d 751, 760 (3d Cir. 2004)) (further citation omitted).  Here, Fleck's allegation is solely based on temporal proximity, as she has not introduced any other evidence that would allow the Court to infer a causal connection between the alleged adverse employment and her request for FMLA leave.  As such, Plaintiff's allegation doubly fails on these grounds.

26

employment action.

  **b.**  **Was Fleck's Termination Causally Related to her FMLA Leave?**

  The final step in establishing a prima facie case of retaliation under the FMLA requires the plaintiff to show that the alleged adverse employment action was causally related to her request for or invocation of her FMLA rights. See Heard, 2009 WL 3081513 at *7 n.9.  As noted by the Keim Court, "[w]hile [defendants] may generally be justified in terminating [p]laintiff[s] because [they] remained absent at the end of [ ] FMLA leave, this does not necessarily preclude the finding that unlawful considerations may have nevertheless have played a determinative role in the particular decision at issue."  Keim, 2007 WL 2155656, at *6.  Such unlawful considerations can be established by a plaintiff in a number of ways, including through "unduly suggestive temporal proximity" and the introduction of circumstantial evidence. Garrett, 2009 WL 3446755, at *4 (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279–80 (3d Cir. 2000)).

  In the instant case, Fleck has demonstrated a genuine issue of material fact as to whether her termination was in retaliation for her exercise of her FMLA rights.  Notably, Plaintiff was still out on FMLA leave when she received the phone call from Mitchell and Schmidt on February 6, 2009 terminating her.  While timing alone is insufficient to establish causation, the fact that Fleck was terminated while still out on valid FMLA leave gives rise to an "unduly suggestive" retaliatory motive on Defendants' part.  See Garrett, 2009 WL 3446755, at *4.  Moreover, Defendants themselves do not deny that they took into account the fact that Fleck had already been out on leave for twelve weeks when they decided to terminate her. (See Mitchell Dep. 33:21–25; Schmidt Dep. 91:4–6, 96:24–25.)  When asked at her deposition about the reasoning behind Defendants' decision to terminate Plaintiff, Mitchell admitted that she considered, "[w]hether [Fleck] was going to be

able—you know, it's been—it was 12 weeks, it was going on 12 weeks that she was out, whether [Attleboro] would be able to accommodate that restriction."  (Mitchell Dep. 33:22–25.)  A reasonable factfinder could conclude that this admission indicates that Defendants placed substantial negative reliance on Fleck's taking FMLA leave in deciding whether to terminate her.  In Treaster v. Conestoga Wood Specialties, Corporation, No. Civ.A.4:09-00632, 2010 WL 2606479 (M.D. Pa. Apr. 29, 2010),  the court addressed a similar contention to the one presently at hand and recognized that, "[g]iven that there is evidence that [defendants] were aware of the plaintiff's invocation of the FMLA and that they were involved in the decisions to . . . terminate the plaintiff's employment, we conclude that the defendant is not entitled to summary judgment on the basis of lack of causation." Id. at *27 (citing Abramson v. William Patterson Coll. of N.J., 260 F.3d 265, 286 (3d Cir. 2001)) (further citation omitted).  This Court adopts and applies the Treaster Court's reasoning to the instant dispute.  The Court therefore finds Plaintiff has carried her burden in demonstrating a causal link between her termination and invocation of her FMLA rights.

## 2.    The Legitimate, Nondiscriminatory Reason

Having found that Plaintiff has successfully established a prima facie case of retaliation for purposes of the FMLA, the Court next considers whether Defendants' had a legitimate, nondiscriminatory reason for their decision to terminate Fleck.  As discussed above with regard to Plaintiff's ADA and PHRA claims, the defendant's burden at this stage is "relatively light."  Here, Defendants allege that they terminated Fleck because Attleboro lacked the necessary staff to cover her request for a reduced work schedule and she had already exhausted her FMLA leave time.[11]

---

[11] At various points throughout their briefing, Defendants allude to the fact that their decision to terminate Fleck was legitimate and nondiscriminatory because Fleck was unable to perform essential functions of her job without accommodation upon her return.  The Court

28

These reasons, taken as true, constitute a legitimate, nondiscriminatory reason and meet the light burden placed on defendants at this stage of the <u>McDonnell Douglas</u> framework.

### 3.     Pretext

The final step of the <u>McDonnell Douglas</u> framework requires the plaintiff to provide evidence that the defendant's proffered legitimate, nondiscriminatory reason was pretextual.  As discussed above in regard to Fleck's ADA and PHRA claims, "[t]o show pretext, the plaintiff must produce evidence which demonstrates a genuine issue of fact with respect to whether the defendant's stated reason for the termination is a fabrication designed to conceal an unlawful reason." <u>Garrett</u>, 2009 WL 3446755, at *7 (citing <u>Kulumani v. Blue Cross Blue Shield Ass'n</u>, 224 F.3d 681, 684 (7th Cir. 2000)).

The Court finds that Plaintiff has carried her burden on this point.  Under the FMLA, "once an employee exceeds the duration of her protected leave, the employer is not obligated by FMLA to keep open the position or to reinstate the employee upon her return." <u>Keim</u>, 2007 WL 2155656, at *6 (citing <u>Cehrs v. Ne. Ohio Alzheimer's Research Ctr.</u>, 155 F.3d 775, 784–85 (6th Cir. 1998)). Here, however, Fleck had not exceeded the duration of her FMLA leave at the time of her termination.  Rather, Fleck received the phone call terminating her on February 6, 2009—six days prior to the expiration of her FMLA leave period on February 12, 2009.  Moreover, despite being orally terminated on February 6th, Fleck's formal termination letter from Attleboro was dated

---

already addressed this issue at the motion to dismiss stage, at which point it dismissed Plaintiff's claims based on this reasoning.  <u>See</u> <u>Fleck</u>, 2011 WL 1899198 at *8 ("While such a refusal to accommodate her . . . may be a violation of the ADA, these requests are fatal to Plaintiff's FMLA [ ] claim.")  Thus, to the extent that Defendants' present allegation rehashes this prior argument, the Court declines to consider it as having already been dismissed from suit.

February 12, 2009.  (See Fleck Termination Letter.)  Such evidence sufficiently constitutes pretext under these circumstances.

The Court is likewise satisfied that Plaintiff has introduced sufficient evidence from which a reasonable jury could find that Defendants' proffered reason was "either a post hoc fabrication or otherwise did not actually motivate" the decision to terminate Fleck.  Garrett, 2009 WL 3446755, at *7 (citing Fuentes, 32 F.3d at 764) (internal quotations omitted).  Specifically, Fleck introduced the Handel Affidavit, in which Handel stated that she was permitted to work part-time upon returning from leave.  (See Handel Affidavit.)  As previously mentioned, Fleck also introduced evidence that Attleboro temporarily staffed her position until it hired a full-time employee in June of 2009.  (See Angela George Hiring Sheet.)  Accordingly, a factual dispute remains as to whether Defendants' claim of an impossible staffing scenario was pretextual.

Based on the above, the Court finds that Plaintiff has presented sufficient evidence from which a reasonable jury could conclude that Defendants violated her FMLA rights when they allegedly unlawfully terminated her employment.  The Court is not satisfied, however, that a genuine issue of material fact remains with regard to Plaintiff's allegation that Defendants' issuance of a disciplinary notice constituted a violation of her FMLA rights.  As such, Defendants' summary judgment motion is granted to the extent Plaintiff's claims are based on unwarranted discipline, but denied in regard to her alleged wrongful termination.

## C.    The ERISA and COBRA Claims[12]

---

[12] In its May 19, 2011 Memorandum and Order, the Court struck Plaintiff's claim for punitive and compensatory damages under ERISA and punitive damages under COBRA, but declined to dismiss either claim in its entirety.  See Fleck, 2011 WL 1899198 at *14.  Thus, Plaintiff is only entitled to equitable relief pursuant to § 502(a)(3) for her ERISA claims, and

ERISA prohibits an employer from interfering with any right to which an employee may be entitled to under a pension benefit plan. See Bunnion v. Consol. Rail Corp., 108 F. Supp. 2d 403, 419 (E.D. Pa. 1999) (citing Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan, 24 F.3d 1491, 1502 (3d Cir.1994); Gavalik v. Cont'l Can Co., 812 F.2d 834, 852 (3d Cir.1987)). One such right is that a health plan administrator must provide sufficient notice of COBRA benefits to a covered employee who would lose plan coverage if terminated from employment. Smith v. Medpointe Healthcare, Inc., No. Civ.A.04-6315, 2007 WL 556914, at *8 (D.N.J. Feb. 15, 2007) (citing 29 U.S.C. § 1161). Here, Plaintiff avers that Defendants intentionally interfered with her ERISA rights by failing to provide her with sufficient and timely notice of her COBRA rights.[13]

Under the COBRA statute, the employer of a terminated employee must notify the health plan administrator of the employee's termination and right to COBRA benefits within thirty days of the termination. 29 U.S.C. § 1166(a)(2). In order to satisfy this notice requirement, the employer must make a "good faith attempt" to notify the COBRA beneficiary, but is not required to ascertain whether the beneficiary actually received such notice. Smith, 2007 WL 556914, at *8 (further citation omitted). The mailing of a notice to the beneficiary's last known address is generally sufficient to constitute adequate notice. Id. (further citation omitted). If the employee does not receive notice within the requisite timeframe, the ERISA statute affords the aggrieved individual a

_____

compensatory damages pursuant to 29 U.S.C. § 1132(c)(1) for her COBRA claims.

[13] Plaintiff also asserts that Defendants violated her ERISA rights based on "the timing and circumstances" of her termination. (Pl.'s Resp. Opp'n 35.) Plaintiff has not, however, explained to the Court how the timing and circumstances of her termination violated her rights under ERISA, nor has she cited to any evidence expounding on this assertion. Given this lack of sufficient explanation and evidence, the Court declines to give merit to this claim.

cause of action against her former employer.  29 U.S.C. § 1132(c)(1)(A).

In the present action, Plaintiff contends that Defendants violated her COBRA and ERISA rights by intentionally failing to inform her within thirty days of her termination date that she was eligible for COBRA benefits.  Specifically, Plaintiffs alleges that she was officially terminated on February 12, 2009, but did not receive any communication from Defendants regarding her COBRA benefits until November 23, 2009.  In response, Defendants assert that summary judgment in their favor is appropriate because, due to a clerical error at Attleboro, Plaintiff's health plan benefits were not actually cancelled until ten months later in December of 2009, and she therefore never suffered actual damages since she was not eligible for COBRA benefits anyway.  Defendants further allege that upon discovering the clerical error, Attleboro timely sent Plaintiff a letter notifying her of her COBRA rights.  Finally, Defendants also aver that, regardless of when she actually received this notice, Fleck was ineligible for COBRA benefits because she maintained supplemental personal insurance during the relevant time period of unemployment.

The Court is not convinced by Defendants' proffered reasoning.  COBRA provides that an employer must provide an aggrieved employee with notice of her COBRA rights within thirty days of the employee's date of termination, *not* within thirty days of the date of the employer's discovery of its mistake. Plaintiff has introduced evidence—notably, Attleboro's November 23, 2009 letter—indicating that she did not receive notice of her COBRA benefits until nearly ten months after her termination.  (See COBRA Benefits Letter.)  The introduction of this evidence sufficiently creates a genuine issue of material fact as to whether or not Fleck received adequate notice under COBRA and ERISA, leading to the conclusion that summary judgment on this point is inappropriate.

The Court is likewise unconvinced by Defendants' assertions that Plaintiff was ineligible for COBRA benefits because she was not actually damaged since she remained covered by her Attleboro insurance for an additional ten months and maintained personal secondary insurance. Neither COBRA nor ERISA, however, require an aggrieved employee to prove that she was "actually damaged" by the lack of notice—the lack of timely notice itself is sufficient to trigger a cause of action. See 29 U.S.C. §§ 1166(a), 1132(c)(1)(A). Moreover, Defendants' argument also fails because Fleck's personal secondary insurance is not the type of additional insurance that would disqualify a person from obtaining COBRA benefits under the ERISA statute. Specifically, Defendants assert that § 1162(2)(D) provides that COBRA coverage ends when the beneficiary becomes covered by another "group health plan," and that Fleck's secondary personal insurance constituted such a plan. Defendants' argument, however, unravels upon a further reading of the statute because§ 1167(a) defines a "group health plan" as an "*employee* welfare benefit plan providing medical care . . . to participants or beneficiaries directly or through insurance, reimbursement, or otherwise." 29 U.S.C. § 1167(1) (emphasis added). As Fleck's secondary insurance was purchased personally and not obtained through her employer, it does not satisfy the definition of a "group health plan" under ERISA. As such, Defendants' proffered argument is without merit.

Therefore, the Court finds that Plaintiff has presented sufficient evidence such that a reasonable jury could find that Defendants violated her rights under ERISA and COBRA when they failed to timely notify her of her eligibility for COBRA benefits. Accordingly, summary judgment on the ERISA and COBRA claims is denied.

### D.      Claims Against Defendant Mitchell Individually

Plaintiff further asserts that Defendant Mitchell, in her individual capacity as Attleboro's Human Resources Representative, violated her FMLA and ERISA rights.  Specifically, Plaintiff asserts that Mitchell violated her rights under the FMLA by making the decision to unlawfully terminate her, and contravened ERISA by failing to provide her with timely notice of her COBRA benefits, refusing to send her short-term leave paperwork to the disability carrier, and providing incorrect salary information to the disability carrier.  Defendants disagree, arguing that Mitchell is not personally responsible for the alleged violation of Plaintiff's rights because she met her obligations as Attleboro's Human Resources Representative. The Court, however, is not satisfied with either party's arguments as both have (1) failed to brief the Court on whether or not Mitchell can even be held individually liable under the FMLA and ERISA, and (2) failed to conduct the proper legal analysis for such claims.

The FMLA defines an "employer" as, *inter alia*, "any person who acts, directly or indirectly, in the interest of an employer."  29 U.S.C. § 2611(4)(A)(ii)( I ).  Courts have held that such individual liability attaches under the FMLA when an employee has "exercised control" over a plaintiff's FMLA leave or acts on behalf of the employer.  Gude v. Rockford Ctr. Inc., 699 F. Supp. 2d 671, 685 (D. Del. 2010) (citing Spagnoli v. Brown & Brown Metro, Inc., No. Civ.A.06-414, 2007 WL 2362602 (D.N.J. Aug. 15, 2007); Hewett v. Willingboro Bd. of Educ., 421 F. Supp. 2d 814, 817–18 n.4 (D.N.J. 2006)).  Neither party has, however, shown the Court whether or not Mitchell qualifies as an "employer" under the statute or whether she "exercised control" over Fleck's FMLA leave. Rather, in their rebuttal and analysis of Plaintiff's claims, Defendants conflate their discussion of claims asserted against Defendants collectively with those asserted against Mitchell individually.

34

(See Defs.' Mot. Summ. J. 11–15.)   While Fleck has at least separately categorized her individualized claims against Mitchell, she merely dedicates one paragraph of her brief to the issue, asserting in extremely generalized language and without any citation to the evidentiary record or the law, that the "evidence demonstrates that FMLA claims should proceed against Ms. Mitchell." (Pl.'s Resp. Opp'n 33) (internal capitalization omitted).   The Court is therefore placed in the difficult position of assessing the scope of both parties' assertions, and, given the lack of proper briefing before it, declines the invitation to do the parties' work for them.

Both parties have likewise failed to show the Court how, if at all, Mitchell could be held individually liable under ERISA.  As outlined by the Court in its May 19, 2011 Memorandum—but subsequently ignored by both parties in their briefing—Section 510 of ERISA makes it unlawful for "any person" to discriminate against a plan participant for exercising her rights under an employee benefit plan.   29 U.S.C. § 1140.   Under the statute, the term "person" includes "an *individual*, partnership, joint venture, corporation, mutual company . . . "   Id. § 1002(9) (emphasis added). Moreover, ERISA defines an "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan[.]"   Id. § 1002(5).   Some courts interpreting these statutory provisions have held certain types of individuals personally liable under ERISA, while others have refused to do so.   See Trs. of the Bldg. Serv. 32B–J Pension, Health and Annuity Funds v. Hudson Serv. Corp., 871 F. Supp. 631, 638 (S.D.N.Y. 1994) ("Under special circumstances . . . the imposition of personal liability for a corporation's ERISA obligations may be warranted.") (internal quotation marks omitted); In re Beacon Ass'n Litig., 745 F. Supp.2d 386, 428 (S.D.N.Y. 2010) (allowing claims for ERISA violations to proceed against individual defendants); but see Solomon v. Klein, 770 F.2d 352, 354 (3d Cir.1985) (finding that Congress did not intend to

expose corporate officers and shareholders to personal liability for their failure to make ERISA benefit contributions); Adams v. Koppers Co., Inc., 684 F. Supp. 399, 400–01 (W.D. Pa. 1988) (finding that a plan is not a "person" under ERISA, but noting that "in some circumstances, a plan *administrator* may have sufficient involvement in employment decisions to incur liability" (emphasis added)); In re RCN Litig., No. Civ.A.04-5068, 2006 WL 753149, at *5 (D.N.J. Mar. 21, 2006) (holding that a committee, by itself, did not have the capacity to be sued); Scarbrough v. Perez, 870 F.2d 1079, 1081–85 (6th Cir. 1989) (refusing to impose personal liability on chief executive officer of a corporation); NYSA–ILA Med. & Clinical Servs. Fund v. Catucci, 60 F. Supp. 2d 194, 206 (S.D.N.Y. 1999) ("An individual cannot be held liable for corporate ERISA violations solely by virtue of his role as officer, shareholder, or manager.") (internal quotation marks citation omitted). The parties in the instant case, however, have not conducted a review of the relevant law to explain to the Court in which category Mitchell belongs.

Moreover, even assuming that Mitchell did fall within ERISA's statutory definitions, both parties have also failed to conduct the proper analysis for such claims.  To prevail on such a claim, a plaintiff must put forth a showing that the individual made a conscious decision to interfere with the plan beneficiary's attainment of ERISA benefits.  Stout v. Bethlehem Steel Corp., 957 F. Supp. 673, 693 (E.D. Pa. 1997).  Direct or circumstantial evidence may be used to establish intent, but if no direct evidence is offered, then the court utilizes a three-step burden-shifting framework akin to that used for other employment discrimination claims.  DiFederico v. Rolm Co., 201 F.3d 200, 205 (3d Cir. 2000).  Neither party has even cited to this legal framework in their briefing, let alone conducted the requisite analysis.

Absent proper briefing and analysis of matters of this significance, the Court declines to grant

summary judgment on this point. The individual claims asserted against Mitchell, therefore, shall proceed forward to trial.

**IV.    CONCLUSION**

For the aforementioned reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part.  Specifically, Defendants' Motion regarding Plaintiff's ADA and FMLA claims based on Defendants' issuance of a written disciplinary notice to Plaintiff is granted. Summary judgment on the remainder of Defendants' Motion, however, is denied.

An appropriate Order follows.